UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | |
| ) | 2:15-cr-00069-JDL-1 |
| **KOURTNEY WILLIAMS,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER ON DEFENDANT KOURTNEY WILLIAMS' MOTION TO SUPPRESS AND REQUEST FOR A *FRANKS* HEARING**

Kourtney Williams seeks to suppress all evidence resulting from his arrest and interrogation on August 6, 2014, and any in-court and out-of-court identification of him made by an alleged victim. ECF No. 77. In a supplement to his motion to suppress, Williams requests a *Franks* hearing and moves to suppress all evidence that was obtained from the search of an apartment and basement storage unit in Lewiston on August 6, 2014. ECF No. 98.

Williams argues that he was arrested without probable cause; that he was questioned while in custody after he made an unequivocal request to speak with an attorney, in violation of the Fifth and Sixth Amendments; and that the procedure resulting in the identification of him by Victim #1 was impermissibly suggestive, in violation of the Fourteenth Amendment, and that the photo identification was not reliable. ECF No. 77 at 2-7. He also contends in his supplemental motion that the search warrant application for the search of Heidi Hutchinson's apartment and storage unit relied on "inconsistent and contradictory" statements made by Hutchinson and did not acknowledge the discrepancies within her statements. ECF

No. 98 at 1-2. He asks that the Court hold a *Franks* hearing to determine whether the asserted omission undermines the finding of probable cause for the search warrant. *Id.* at 3. For the reasons discussed below, I grant Williams' motion to suppress in part with respect to his interrogation and deny it as to all other respects, and I deny his supplemental request.

## I. FACTUAL BACKGROUND

On the evening of August 2, 2014, the Maine State Police ("MSP") responded to a 911 call reporting a home invasion and robbery at a residence on Garfield Road in Minot, Maine. ECF No. 87 at 1. At the time, the homeowner, a suspected drug trafficker, was not present, but three male associates (referred to as "Victims #1, 2, and 3") were inside. *Id.* According to the statements made by the victims, three partially-disguised males, two of whom they believed to be black, broke into the residence around 10:30 p.m. by shattering a glass door and entering the living room. According to Victim #1, one of the robbers, who was the shortest of the three, was carrying a handgun and ordered him to the ground. Victim #1 was able to look up from the floor, and he saw the face of the armed robber, whose face covering had fallen. Victim #1 later identified Williams as this robber in a photo array.

Another robber, the second tallest, carried a crowbar and struck Victim #1 with it about the head and body. This robber also struck Victim #3 with the crowbar. The robbers tried to restrain Victims #1 and #3 with plastic zip ties, but the zip ties were too short and, thus, did not work. The robbers took Victims #1 and #3 to a back room, which contained a safe, and demanded that Victim #1 open the safe. The first robber

2

had his gun pointed at Victim #1. Victim #1 told the robber that he was a guest of the homeowner and that he did not know the combination to the safe. The third robber then took Victim #1 to the owner's bedroom. The third robber then found a handgun belonging to the owner in the bedroom and took it.

Victim #1 was later led from the residence to the residence's detached garage with a handgun pressed against his head. Eventually, all three victims were led outside, behind the residence. Shortly thereafter, Victim #1 fled the scene and ran to a neighbor's house. He later observed the three robbers running to a car parked near the site of the home invasion, jumping into the car, and driving away. Victim #1 stated that he saw and recognized the Caucasian woman driving the car but did not recall her name at that time; a friend of his later told him that it was Heidi Hutchinson.

MSP Trooper Eric Paquette responded to a 911 call made by a neighbor, and he spoke with each of the three victims at the scene. Def. Ex. 4. He subsequently applied for and obtained a state search warrant for the Minot residence and garage. ECF No. 87 at 2-3. While the warrant was being executed, the homeowner returned and reported that his 9mm pistol might have been stolen from his bedroom. *Id*. at 3. Drug Enforcement Administration ("DEA") Task Force Officer David Madore interviewed the homeowner, who admitted to being a drug trafficker of oxycodone pills. *Id*. A DEA search of the Minot residence conducted on August 3, 2014, resulted in the recovery of illegal drugs and drug proceeds. *Id*. By August 6, 2014, law enforcement authorities, based on information provided by a confidential informant,

3

identified Heidi Hutchinson as Williams' girlfriend and the driver of a vehicle matching the description that Victim #1 had given of the getaway car. *Id.* Investigators from the MSP and Lewiston Police Department ("LPD") interviewed Heidi Hutchinson twice on August 6, 2014, once before Williams' arrest and once immediately after his arrest. *Id.*; *see* Def. Ex. 2; Def. Ex. 2A.

During the first interview of Hutchinson, which took place at her workplace, Hutchinson initially said that she was at home the evening of August 2, 2014. As the questioning progressed, she admitted that she drove Williams and two other men to Minot on the evening of August 2. Def. Ex. 2. During the second interview of Hutchinson, which took place at the LPD, she explained how she came to know Williams; described the events of the evening of Saturday, August 2, 2014, and the preparations that had preceded it; and provided details about Williams' use of the basement storage unit of her apartment to store the guns associated with the home invasion. Def. Ex. 2A.

Williams was arrested in a cab outside of Hutchinson's residence on August 6, 2014, after the police had completed their first interview with Hutchinson. ECF No. 87 at 4. Williams was then taken to an interview room at the LPD, where MSP Trooper and Detective Adam Fillebrown advised him of his *Miranda* rights, and Trooper Fillebrown and LPD Detective Derrick St. Laurent questioned him. Gov't Ex. 3.

LPD Detective Tyler Michaud and MSP Trooper Fillebrown interviewed Victim #1 on August 6, 2014, at the LPD. During this interview, they presented a

photo array from which Victim #1 identified Williams as the robber who was carrying the handgun from the six men depicted in the array. Def. Ex. 3; Gov't Ex. 4.

## II. LEGAL ANALYSIS

Williams seeks to suppress all evidence resulting from his arrest and interrogation on August 6, 2014. He also seeks a *Franks* hearing on the alleged omission of information from the affidavit used to obtain the warrant for the search of Hutchinson's apartment and basement storage unit.

### A. Probable Cause to Arrest

Williams asserts that he was arrested without a warrant and without probable cause. ECF No. 77 at 2-3. He submits that the alleged probable cause to arrest him was deficient because it was "based on the hearsay account of an unvetted informant and the inconsistent statements of an alleged co-conspirator who had much to gain by shifting blame." *Id.* at 3.

Probable cause to support an arrest "exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect committed or was committing a crime." *United States v. McFarlane*, 491 F.3d 53, 56 (1st Cir. 2007) (quoting *United States v. Burhoe*, 409 F.3d 5, 10 (1st Cir. 2005)); *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987). The court must consider what the officers knew at the time of the arrest and evaluate the totality of the circumstances. *McFarlane*, 491 F.3d at 56.

At the time of Williams' arrest, the Lewiston Police had knowledge of sufficient facts and circumstances to reasonably believe that Williams was one of the three perpetrators of the armed home invasion on August 2, 2014. MSP Trooper Tyler Stevenson testified that he, LPD Detective St. Laurent, and MSP Trooper Fillebrown interviewed Heidi Hutchinson inside her place of employment on August 6, 2014. Hutchinson's statements during this interview, consistent with the statements of the victims describing the events of August 2, 2014, at the Minot residence, provided ample support for probable cause to arrest Williams. Hutchinson recounted that Williams (whom she referred to as "Finna") asked her to take him for a drive, and, after picking up two of his friends, one by a Motel 6 and one on Horton Street, they drove in her car to a residence on Garfield Road in Minot, where the home invasion took place. She said that she parked on the side of the road, the three men exited her car, and, about twenty minutes later, they came running back and jumped into the car. When they came back, they had a backpack that was filled and, as they drove away, they threw a hooded sweatshirt out the window. She also explained that earlier that day, she, Williams, and one of the two other men, "V," had driven by the house on Garfield Road. Hutchinson also told the police that she had previously purchased 9mm bullets at Walmart at Williams' request, and she knew that Williams had kept a gun at her house for a few weeks. She stated that she saw the gun the evening of August 2.

Although at the outset of the first interview Hutchinson denied knowing of the crime and denied knowing Williams, about ten minutes into the interview she began

6

to disclose details about her relationship with Williams and what had occurred on August 2. Over the course of the first interview Hutchinson made a number of statements that inculpated Williams and herself. As Trooper Stevenson and Detective St. Laurent testified, it is common for a suspect while being interrogated to initially hesitate and deny any knowledge of a crime. Trooper Stevenson stated that Hutchinson started telling the truth unusually quickly for someone in her situation.

Hutchinson's statements were corroborated by independent evidence. The victims described three men breaking into the Garfield Road home the evening of August 2, 2014. Victim #1 stated that one of them had a gun and that the robbers took some marijuana, a PlayStation, $200 in singles, and sneakers from the house. Victim #1 also stated that he saw the three men running to a car after the invasion and robbery. The car he described resembled Hutchinson's vehicle. In addition to Hutchinson's and the victims' statements, there was supporting physical evidence in the form of zip ties found at the Garfield Road home, as well as the fact that a gun was missing from the home.[1]

The threshold for probable cause to arrest Williams was amply met in this case.

**B.   Interrogation of Williams**

Williams contends that after being advised of his *Miranda* rights, he made an unequivocal request to speak with an attorney after the questioning had begun, but that he continued to be interrogated in violation of his right to counsel. ECF No. 77

---

[1] As for the confidential source who spoke with Detective St. Laurent, because it is not known how the source came to know the information he or she reported to Detective St. Laurent, as the Government acknowledged at the suppression hearing on October 8, 2015, that information is not considered part of the basis for probable cause.

at 3-4. Under *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), an accused has a right to have counsel present during a custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981). It is undisputed that Williams was in custody when he was interrogated at the Lewiston Police Department. Oral Arg. Hr'g, Aug. 11, 2015; *see* ECF No. 87 at 10.

When a suspect asserts his right to counsel, the interrogation must stop and the police may not reinterrogate the suspect until counsel is present, unless the suspect himself initiates further conversation. *United States v. Ortiz*, 177 F.3d 108, 109 (1st Cir. 1999). A request for counsel must be clear and unambiguous. *United States v. Oquendo-Rivas*, 750 F.3d 12, 18-19 (1st Cir. 2014) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). The invocation of the right to counsel must be such that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 19 (citations omitted).

At about 8.5 minutes into the interrogation, Williams asked whether he could call a lawyer:

> DEFENDANT: Can I call a lawyer, Mr. Howaniec, son, 'cause you're not - you're not telling me…
> ST. LAURENT: So we're ending this conversation?
> DEFENDANT: Yeah, you're not telling me what you're charging me with. You're not telling me nothin'.
> FILLEBROWN: Well, we're trying to get there with ya, but…

Gov't Ex. 3 at 8:38-8:44. By his response, "Yeah. . ." to the question, "So we're ending this conversation?", any ambiguity regarding Williams' request to speak to a lawyer and end the interrogation was resolved. The officers, however, then continued to engage him in conversation. Because the officers ignored Williams' request and

8

continued to attempt to get him to speak, the statements he subsequently made were obtained in violation of *Miranda* and are ordered suppressed.

## C.  Photo Identification

Williams argues that the identification of him by Victim #1 must be excluded because it was based on an unfairly suggestive photo array and was unreliable. ECF No. 77 at 6-7. A court will exclude an out-of-court identification based on a photo array only if there is "a very substantial likelihood of irreparable misidentification." *United States v. DeCologero*, 530 F.3d 36, 61 (1st Cir. 2008); *United States v. Melvin*, 730 F.3d 29, 34 (1st Cir. 2013). This involves a two-step analysis: first, whether the identification procedure was impermissibly suggestive, and second, if so, whether, when viewed in light of the totality of the circumstances, the identification was still reliable. *DeCologero*, 530 F.3d at 62 (citing *United States v. Henderson*, 320 F.3d 92, 100 (1st Cir. 2003); *United States v. Holliday*, 457 F.3d 121, 125 (1st Cir. 2006)). In the first step, the court considers "whether the photo array included, as far as was practicable, a reasonable number of persons similar in appearance to the suspect." *Id.* (citing *Holliday*, 457 F.3d at 125-26). The Supreme Court has identified five factors for consideration in the second step:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation.

*Henderson*, 320 F.3d at 100 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

Williams asserts that the array did not portray suspects with similar physical characteristics as required, as the other men in the photo array were all bald and only he had hair. ECF No. 77 at 6-7. The Government argues that a photo lineup is not unduly suggestive simply because the defendant can be distinguished from the others shown. ECF No. 87 at 8.

I conclude at the first step that the photo array was unduly suggestive. Under the circumstances, it was reasonably practicable for the police to prepare a photo array that would include a reasonable number of persons with hair similar to the defendant. Instead, two of the men in the array have no hair, two appear to have baldness extending to the crown of their heads, and only two—including Williams— have a hairline visible on their foreheads. The hairlines of the men in the photo array were particularly significant because Victim #1 had observed two primary physical characteristics of the robber he identified as being Williams: his race and his hair. However, four of the six men in the array have no visible hair on their foreheads. The photo array was, therefore, impermissibly suggestive because it failed to depict a reasonable number of persons of similar appearance. *See Holliday*, 457 F.3d at 125-126; *United States v. Castro-Caicedo*, 775 F.3d 93, 99 (1st Cir. 2014).

Because I conclude that the array was impermissibly suggestive, I proceed to the second step and consider whether the identification is still reliable when viewed under the totality of the circumstances. For the following reasons, I conclude that the identification should be deemed reliable.

First, Victim #1 had repeated opportunities to view the armed robber's face during the course of the approximately twenty-minute duration of the home invasion as he was taken to different locations both inside and outside the residence by the robbers. He stated that the armed robber's face was not covered and that he got "a good look" at him, and observed that he had long hair with braids that were "a little loose," "a little fuzzy." In addition, according to the witness, the lighting was "perfect" inside the house.

Second, Victim #1 was attentive as he viewed the armed robber who yelled at Victim #1 to get down at gunpoint, forced him to move around the residence, and made other demands of him at gunpoint, such as to open the safe. While Victim #1 admitted to having smoked two marijuana joints a few hours before the home invasion, and had suffered injuries to his head and body during the home invasion after having been struck with a crowbar, he testified that his mind was clear by the time he spoke with Trooper Paquette immediately after the invasion. Trooper Paquette testified that Victim #1 was very emotional and appeared erratic, but also that Victim #1 was able to answer his questions quickly and he did not observe Victim #1 to be impaired. In addition, Victim #1's initial description was accurate and he appeared quite certain when he pointed at Williams, the sixth person depicted in the photo array. He had been instructed to take his time and was not otherwise prompted in his identification. *See* Gov't Ex. 4. Finally, only a few days had passed between the home invasion on August 2, 2014, when Victim #1 observed the armed robber, and he was presented with the photo array at the LPD on August 6, 2014.

In sum, I find that although the photo array was impermissibly suggestive, the identification—viewed in light of the totality of the circumstances—is nonetheless sufficiently reliable so that it is fair and appropriate for a jury to assess Victim #1's identification of the defendant for itself.

### D.  Application for a Warrant for the Search of Hutchinson's Residence and Storage Unit

Williams argues that the search warrant application prepared by Trooper Stevenson relied primarily on "conflicting statements" made by Hutchinson during her two interrogations and that Trooper Stevenson, in his affidavit, "appeared to have purposefully sidestepped the considerable defects" in Hutchinson's statements. ECF No. 98 at 1-2.  He posits that a *Franks* hearing is required to determine whether information Trooper Stevenson omitted "represented either a knowing and intentional misrepresentation or a reckless disregard for the truth." *Id.* at 3.  The Government asserts that Williams lacks standing to challenge the search of the residence and storage unit because he had no reasonable expectation of privacy. ECF No. 103 at 2.  The Government argues that the affidavit in support of the warrant application for the search of the residence and storage unit does not rely on Hutchinson's statements alone and that Williams has failed to make a showing that the affiant made a material omission reflecting a reckless disregard for the truth. ECF No. 103 at 3-4.

#### 1.  Standing to Challenge the Search

A defendant claiming that his Fourth Amendment rights were violated by a search or seizure has the burden of establishing that he had a legitimate expectation

12

of privacy in the place searched or the thing seized. *United States v. Rheault*, 561 F.3d 55, 58-59 (1st Cir. 2009); *United States v. Battle*, 637 F.3d 44, 48 (1st Cir. 2011). The inquiry comprises two questions: "first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." *Rheault*, 561 F.3d at 59 (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

Williams challenges the search warrant executed at Hutchinson's apartment and storage unit. According to his affidavit (ECF No. 104), Williams had been involved in an intimate relationship with Hutchinson for about two months prior to his arrest and had been spending two to three nights a week at her apartment. He also kept clothes in the apartment. Hutchinson confirmed that she and Williams had been in a romantic relationship and he had regularly stayed with her at her apartment. Accordingly, Williams had an actual, subjective expectation of privacy in the apartment, and this expectation was objectively reasonable given that Williams was not an occasional overnight guest but, rather, regularly spent extended periods of time at Hutchinson's residence. *See Minnesota v. Olson*, 495 U.S. 91, 98-100 (1990) (stating that an overnight guest has a legitimate expectation of privacy in his host's home). With respect to the basement storage unit, Hutchinson, who was the only one with keys to it other than the management, gave the keys to Williams and permitted him to use the storage unit. Williams' expectation of privacy in the storage unit thus meets the two-part test as well.

### 2. *Franks* Hearing and Probable Cause for the Search Warrant

Because I conclude that Williams has standing, I proceed to his claim that omissions in Trooper Stevenson's affidavit undermine the finding of probable cause for the search warrant. In order to be granted a *Franks* hearing, a defendant must make "a substantial preliminary showing that: 1) the warrant affidavit contains a false statement made knowingly and intentionally, or with reckless disregard for the truth, and 2) that the allegedly false statement was necessary to the finding of probable cause." *United States v. Hicks*, 575 F.3d 130, 138 (1st Cir. 2009) (citing *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978)) (internal quotation marks omitted). "A material omission of information may also trigger a *Franks* hearing." *United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002). As I will explain, Trooper Stevenson's affidavit did not omit any facts of consequence, and thus, there is no justification for a *Franks* hearing.

In his affidavit, Trooper Stevenson set forth the account Hutchinson had given in her two interviews. She stated that she drove to Minot with Williams and a person she referred to as "V" earlier on August 2, 2014. She stated that she returned that evening with Williams, "V," and another man, and that the three men returned to the car after about twenty minutes. The inconsistencies that Williams points to were either not of consequence or resulted from Hutchinson's initial hesitation, at the start of the first interview, to provide truthful information. Trooper Stevenson testified that he did not purposefully omit any information from his affidavit and that he did not mention Hutchinson's initial denial of involvement in the crime in his affidavit

14

because she began to tell the truth very soon into the questioning. The information related to Hutchinson's short-lived denial of knowledge of the crime was not material.

Even if information about Hutchinson's initial dissembling and any minor discrepancies between the first and second interviews had been included in the affidavit, it would not have affected the finding of probable cause by the magistrate judge. The affidavit establishes on its face facts and circumstances from which the magistrate judge could reasonably conclude that a crime had been committed and that evidence of the crime—an armed home invasion and robbery of the Minot residence—would be found at Hutchinson's apartment and storage unit. *See United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) ("A warrant application must demonstrate probable cause to believe that (1) a crime has been committed-the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched-the so-called 'nexus' element.") (citation omitted). In addition, the credibility of Hutchinson's statements is not significantly diminished by her initial dissembling, which is common in these types of situations. The material facts she provided in the two interviews were consistent and were corroborated by the victims' statements, physical evidence from the Minot residence, and surveillance footage from Motel 6, all of which was detailed in the affidavit. *See* Gov't Ex. 1.

For the foregoing reasons, Williams' motion to suppress is **GRANTED** in part as to the request to exclude a portion of his interrogation and **DENIED** in all other respects. Williams' supplementary request for a *Franks* hearing is **DENIED**.

**SO ORDERED.**

Dated this 6th day of November, 2015.

                                               **/s/    JON D. LEVY**
                                               **U.S. DISTRICT JUDGE**