1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF MAINE

3    _____

4    UNITED STATES OF AMERICA,                CRIMINAL ACTION

5              Plaintiff              Docket No:  2:15-00069-JDL-1

6
           -versus-

7

8    KOURTNEY WILLIAMS,

9              Defendant
     _____

10                   Transcript of Proceedings

11

12   Pursuant to notice, the above-entitled matter came on for
     **Sentencing** held before **THE HONORABLE JON D. LEVY,** United
13   States District Court Judge, in the United States District
     Court, Edward T. Gignoux Courthouse, 156 Federal Street,
14   Portland, Maine, on the 16th day of June 2021 at 2:19 p.m. as
     follows:

15

16   Appearances:

17   For the Government:   Darcie N. McElwee, Esquire
                           Assistant United States Attorney
18
     For the Defendant:  Jeffrey W. Langholtz, Esquire
19

20   Also Present:  Heather Belanger, U.S. Probation

21                      Lori D. Dunbar, RMR, CRR
                        Official Court Reporter
22
                     (Prepared from manual stenography and
23                      computer aided transcription)

24

25

```
 1                    (Open court.  Defendant present.)

 2               THE COURT:  Good afternoon.  We are now convening a

 3     sentencing hearing in the case of United States versus

 4     Kourtney Williams, Docket 15-CR-69.  Counsel, would you please

 5     note your appearances for the record.

 6               MS. MCELWEE:  Good afternoon, Your Honor.  Darcie

 7     McElwee, Assistant United States Attorney, for the United

 8     States.

 9               THE COURT:  Good afternoon.

10               MR. LANGHOLTZ:  Good afternoon, Your Honor.  Jeff

11     Langholtz for Kourtney Williams.

12               THE COURT:  Good afternoon.  The record will reflect

13     also that Probation Officer Heather Belanger is present as

14     well, and of course Mr. Williams is here as well.

15          Counsel, with respect to masks, if you are vaccinated

16     you are welcome to take your mask off when you're addressing

17     the Court.  And that's true for Mr. Williams as well, if he is

18     vaccinated.  Mr. Langholtz, do you know whether Mr. Williams

19     is vaccinated?

20               MR. LANGHOLTZ:  I'm not sure.

21               THE COURT:  Would you ask him, please?

22               MR. LANGHOLTZ:  Mr. Williams, are you vaccinated?

23     First shot.

24               THE COURT:  All right.  So, Mr. Williams, I'm going

25     to ask you to maintain your mask on at all times.
```

1          And, Attorney McElwee, has the Government provided

2     notice to any victims entitled to notice under the law?

3               MS. MCELWEE:  We have, Your Honor.

4               THE COURT:  Thank you.

5          Mr. Williams, this is your sentencing hearing.  Of

6     course, you've had a previous sentencing hearing, but this

7     case is back after having been considered by the First Circuit

8     Court of Appeals.  So the overall purpose of today's hearing

9     is for me to sentence you based upon your conviction.  I'm

10    going to hear from the attorneys and I'll hear from you as

11    well if you wish to speak.

12         I'm now going to be asking you and your attorney a

13    series of questions.  I want to be sure that you have read and

14    understand the revised presentence report in this case.  I

15    also want to be sure that there's nothing that interferes with

16    your ability to understand what's taking place here in court

17    today, and overall I want to make sure that you understand the

18    sentence that I arrive at and the reasons for it.

19         Now, if you don't understand a question that I ask, tell

20    me that and I'll rephrase it.  And if you wish to speak with

21    Mr. Langholtz before responding to a question, let me know

22    that and I'll give you a chance to do so.  Do you understand?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  All right.  Mr. Langholtz, would you

25    take the microphone and bring it over to Mr. Williams' side of

```
 1    the Plexiglas partition?  And, Mr. Williams, you can remain
 2    seated at this point in the hearing.  Why don't you pull that
 3    microphone down a bit so that it will be more directly pointed
 4    at you.  Thank you.  I didn't hear your answer to my last
 5    question.  Did you understand?
 6               THE DEFENDANT:  Yes, sir.
 7               THE COURT:  Thank you.  Mr. Williams, are you
 8    currently taking any medications?
 9               THE DEFENDANT:  No.
10               THE COURT:  Have you had any other drugs or alcohol
11    in the past 24 hours?
12               THE DEFENDANT:  Nope.
13               THE COURT:  Is there anything at all that might
14    interfere with your ability to understand what's taking place
15    in court today?
16               THE DEFENDANT:  No, sir.
17               THE COURT:  Are you thinking clearly this afternoon?
18               THE DEFENDANT:  Yes, sir.
19               THE COURT:  Do you authorize Attorney Langholtz to
20    act and speak on your behalf?
21               THE DEFENDANT:  Yes, sir.
22               THE COURT:  Mr. Langholtz, did you review with your
23    client the most recent version and the prior versions of the
24    revised presentence report in this case?
25               MR. LANGHOLTZ:  I did, Your Honor.
```

```
 1              THE COURT:  Are you satisfied that he understands

 2    the reports?

 3              MR. LANGHOLTZ:  Yes, Your Honor.

 4              THE COURT:  Mr. Williams, did you receive a copy of

 5    the most recent revised presentence report?

 6              THE DEFENDANT:  Yes, sir.

 7              THE COURT:  And have you reviewed that report as

 8    well as all others with your lawyer in this case?

 9              THE DEFENDANT:  Yes, sir, yeah.

10              THE COURT:  Are you satisfied that you understand

11    them?

12              THE DEFENDANT:  Yeah.

13              THE COURT:  All right.  Mr. Langholtz, at this time

14    I'd like to take up objections that you have to the report

15    itself.  I note that in your memorandum you argue that your

16    client should not receive three criminal history points for

17    the offense in Paragraph 37 because the sentence for that

18    offense was imposed on the same day as the offense in

19    Paragraph 36 and arose from the same incident with no

20    intervening arrest.

21         With respect to that objection, before you speak further

22    on it, in the hopes of perhaps shortening our discussion about

23    it, I agree with that objection.  I'm going to hear from the

24    Government if it disagrees, but it seems to me the objection's

25    correct but that the change should be that he receives no
```

```
 1    points for Paragraph 36 and three points for Paragraph 37.

 2    Ms. Belanger explained to me the reason why the allocation

 3    should be made to Paragraph 37; I frankly forget it at the

 4    moment.  Ms. Belanger, could you remind me, please?

 5            PROBATION OFFICER:  Thirty-seven is the

 6    guidelines -- there's always a theme of the most significant

 7    penalty is what would be used.  And for these -- this

 8    particular situation between Paragraph 36 and 37, 37, assault

 9    with a dangerous weapon in Massachusetts is considered a crime

10    of violence, which would carry -- which would make it a

11    predicate offense, causing the most serious penalty under the

12    gun guideline at 2K2.1.

13            THE COURT:  Thank you.

14        Mr. Langholtz, do you wish to address this?

15            MR. LANGHOLTZ:  Yes, Your Honor.  We've argued

16    before in great detail some of the objections we've had

17    reference these two paragraphs.  The Court concurs or accepts

18    one of the objections, which would be it should only be

19    counted once, three points for both.  I believe we had argued

20    strenuously and briefed the issue about whether the assault

21    with a dangerous weapon should be considered as -- as a base

22    level enhancement, bringing it from 22 to 26.  That has been

23    objected to, briefed, argued, and we maintain that part of the

24    objection, Your Honor.

25            THE COURT:  All right.  That portion -- Attorney
```

1   McElwee, do you want to respond before I rule?

2       MS. MCELWEE:  Those are two -- in my mind those are

3   two different objections.  So with regard to the first

4   objection, Paragraphs 36 and 37, I agree with Ms. Belanger and

5   the Court that it should receive zero points for 36 and three

6   points for 37, because it's clear that those two are related,

7   the very same incident, and there was a typographical error in

8   the first -- the third revised PSR.

9       THE COURT:  So with respect to what we're now

10  referring to as the first objection, that objection is

11  sustained.  The defendant will not receive three points as

12  indicated in Paragraph 36, but the three points as indicated

13  in Paragraph 37 will stand.

14      Now, with respect to the related objection that you

15  made, Mr. Langholtz, is there anything further you wanted to

16  add to that point?

17      MR. LANGHOLTZ:  Nothing other than what has already

18  been briefed and discussed and argued, nothing additional,

19  thank you.

20      THE COURT:  All right.  Attorney McElwee?

21      MS. MCELWEE:  I don't have anything additional other

22  than what I cited in -- on Page 4 and 5 of my sentencing memo,

23  Judge, and that is that we maintain that the conviction in

24  Paragraph 36, that is assault -- I'm sorry, let me just

25  refresh my memory.  Oh, yes, yes.  I -- I argue here, Judge,

1    that the use of a dangerous weapon is what makes it a crime of

2    violence, and that was a ruling that the Court previously made

3    at the first sentencing.  And so we maintain that he should be

4    a 26, not a 22.

5           THE COURT:  I have considered the parties' arguments

6    which they are reasserting and I previously ruled on in this

7    case, and I'm standing by my earlier ruling and so the

8    objection is denied.

9           Mr. Langholtz, do you have other objections?

10           MR. LANGHOLTZ:  Your Honor, I am hopeful that the

11    Court adopts my calculations, which would be a BOL of 22, plus

12    two points, plus four points, for a total of 28.  And the

13    objections that have been provided to probation, one objection

14    has been agreed to and they changed the criminal history;

15    however, they have rejected the other objections that I've

16    made and we stand by them.

17           THE COURT:  Well, so that I'm clear and the record

18    is clear as well, let's be more specific in identifying what

19    objections you still stand by.  Your objection to

20    Paragraph 38?

21           MR. LANGHOLTZ:  We objected to Paragraph 7, 8, 13,

22    14, 7, and 18.  The paragraph -- I'll address Paragraph 38

23    because the Court brings that up right now.

24           THE COURT:  Mr. Langholtz, let me step back a

25    moment.  I don't have the -- I don't have the paragraph

1      numbers of the report memorized, and so you need to describe

2      to me the substance of your objection.

3              MR. LANGHOLTZ:  Thank you, Your Honor.  With respect

4      to COF -- excuse me, Your Honor, let me just get my document

5      here.

6              THE COURT:  Would it be helpful if we referred to

7      the objections as outlined at ECF No. 470, which is the

8      addendum to the presentence report dated April 9th of 2021?

9      We have just addressed what was labeled as Objection 1, and

10     there are two others then listed.  Objection 2 is as to

11     Paragraphs 38, 40, and 41.

12             MR. LANGHOLTZ:  Yes, Your Honor, thank you.  With

13     respect to 38, the CWOF should not be counted.  The argument

14     in the -- in the memorandum outlines the -- Mr. Williams'

15     position.  Basically the procedures that were followed by the

16     Court below are not consistent with the procedures that were

17     outlined in Morillo.  The -- basically the record that was

18     provided to the Court is unclear as far as whether the

19     procedures were properly followed.  The -- the Court in

20     Morillo outlines exactly what those procedures should be based

21     on the documents that are presented to the Court.  With

22     respect to the docket numbers that were related to the CWOF

23     those procedures were not followed completely and, therefore,

24     those matters should not be considered, Your Honor.

25             THE COURT:  Thank you.  Attorney McElwee?

1          MS. MCELWEE:  Your Honor, as we responded in our

2    sentencing memo, based on the First Circuit's ruling in U.S.

3    versus Dobovsky and Reyes, R-E-Y-E-S, the First Circuit has

4    held that Massachusetts continued without a finding

5    dispositions are scored criminal history points when

6    accompanied by admission to sufficient facts.  And the record

7    in this case, as described by probation, is that there were --

8    it was accompanied by an admission to sufficient facts.  And

9    so under both Massachusetts law and federal law it appears

10   that these two paragraphs should both receive points, the

11   first being because he had the CWOF and the second being

12   because he was under a criminal justice sentence.  That's why

13   they're related.

14          MR. LANGHOLTZ:  I'd like to respond to that, Your

15   Honor.  With respect to Reyes, the problem with Reyes is I

16   don't think the First Circuit addressed this issue squarely.

17   Basically they said that it was side skirting.  They said the

18   issue wasn't addressed below in the district court; therefore,

19   the plain error standard would apply rather than abuse of

20   discretion.  And because of the assumed use of plain error,

21   the case would not rise to that level, and they side skirted

22   the issue about whether the lower standard would be used or

23   could be used.  They skirted the issue of ruling on that

24   according to the lower standard, because that issue was not

25   brought up in the district court.  Here we are bringing it up

1    in the district court and preserving this based on the lower

2    standard, Your Honor.

3         THE COURT:  Thank you.  I'm going to defer ruling on

4    that objection.  I want to move on to the next one, that's

5    objection three.  Just one moment, please.  Please go ahead.

6         MR. LANGHOLTZ:  Thank you, Your Honor.  The issue

7    relative to Raymond was brought up below in quite a bit of

8    detail; cases were cited.  The law has not changed

9    significantly with respect to that, and we abide by the

10   briefings and the arguments that we've made previously.  But

11   in sum, the case law supports our position with respect to

12   that matter.  Raymond -- State v. Raymond supports our

13   position.  Mulkern does also.  Basically the issue has been

14   briefed.  It's all -- it's been brought up again for the same

15   reasons.

16        And additionally, Your Honor, this case was -- this

17   issue was heavily litigated prior before this Court.  And one

18   other additional point I'd like to make also now is that

19   Mr. Williams entered an Alford plea also, which I'm not sure

20   was addressed the first time around.  But I think what the

21   problem is is I think the Court previously when it ruled

22   against our position went too far with looking at a number of

23   documents that it probably shouldn't based on indivisibility

24   and based on I think going further out in the Shepard area,

25   going into documents that probably shouldn't be considered the

1  way the Court did.

2       So based on those reasons, based on what's already been

3  briefed, what -- the additional arguments making -- that we're

4  making now, that matter, that case, should not be considered a

5  crime of violence for purposes of predicate offenses.

6           THE COURT:  Thank you.  Attorney McElwee?

7           MS. MCELWEE:  So, Judge, I thought this was the

8  decision that you just made a few minutes ago that you said

9  you were not going to revisit, and so I'm happy to argue it

10  again but I don't want to waste the Court's time.  I -- we

11  obviously litigated that heavily, and the Court concluded that

12  it was a crime of violence for both purposes of 2K2.1 and

13  career offender.  We feel strongly that that use of a

14  dangerous weapon is part of the charge and that the Court made

15  a proper ruling at the time.

16           THE COURT:  Thank you.  On that point I'm going to

17  stand by my earlier decision in this case and so the

18  objection's overruled.  Are there any other objections?

19           MR. LANGHOLTZ:  Can I look at my notes, please?

20           THE COURT:  Sure.

21           MR. LANGHOLTZ:  Thank you.  There was one -- yes,

22  Your Honor, with respect to obstruction, our position on that

23  is based on the -- the items cited by probation we believe

24  that the -- that's an ambiguous issue.  We don't believe that

25  the Government or probation has shown by the proper standard

 1   whether that is really risen to Mr. Williams trying to

 2   interfere with the process.  So we believe that the nature and

 3   purpose of those calls were at best ambiguous and should be

 4   resolved with the rule of lenity and not considered

 5   obstruction of justice, and the two points should not be added

 6   on because of that, Your Honor.  And I would just like to

 7   continue to look at my notes, please.

 8              THE COURT:  Mr. Langholtz, I take it you're

 9   referring to Paragraph 17 of the third revised report?

10              MR. LANGHOLTZ:  Yes, the enhancement, two-point

11   enhancement for obstruction of justice.

12              THE COURT:  Is the defendant disputing the accuracy

13   of the quoted language?

14              MR. LANGHOLTZ:  No, we're not.

15              THE COURT:  So I take it that you're arguing

16   essentially what interpretation or what weight -- what weight

17   and interpretation I should make of it?

18              MR. LANGHOLTZ:  Yes, Your Honor.  Thank you.

19              THE COURT:  Attorney McElwee, do you want to speak

20   to that issue?

21              MS. MCELWEE:  Sure.  I wasn't prepared to do so

22   because it wasn't a preserved objection, but I'm happy to

23   respond that the Court previously found the defendant did

24   obstruct based on the very same evidence.  Nothing has changed

25   in that regard.  The Court will recall it was telephone calls,

1    as well as a letter, and that there was certainly pressure

2    being placed on Ms. Hutchinson to change her story and/or

3    not -- not participate in the trial and testify.  And so

4    the -- the Government previously argued and the Court

5    previously found that Mr. Williams had obstructed justice.

6            THE COURT:  Thank you.  Based upon the information

7    contained in Paragraph 18 of the third revised report, I'm

8    satisfied that the Court accurately characterizes the

9    communications by the defendant as an attempted obstruction of

10   justice and therefore the objection's overruled.  Are there

11   any other objections?

12           MR. LANGHOLTZ:  Yes, Your Honor.  Two things.  First

13   off, I'd like to address criminal history, and I understand

14   that we've dropped down one category level because of the

15   three points that were removed.

16           THE COURT:  Right.

17           MR. LANGHOLTZ:  So I believe we're now at IV.

18           THE COURT:  Yes.

19           MR. LANGHOLTZ:  Okay.  So that objection is removed,

20   and we've also asked for a departure with respect to criminal

21   history.  And I'm not sure if the Court wants me to address

22   that now as part of the procedural issue or whether that would

23   be more substantive.

24           THE COURT:  Is that -- that's your argument that

25   the -- his record overstates the seriousness based upon racial

1    disparities in the Commonwealth of Massachusetts in charging

2    decisions?

3              MR. LANGHOLTZ:  Yes, Your Honor.  In looking at

4    Mr. Lara's briefing I also notice that Attorney Rioux had done

5    an extensive analysis of cases within this district that are

6    congruent with the argument I made with respect to my client's

7    criminal history in Massachusetts.

8              THE COURT:  All right.  We'll address that, then.

9    You can argue that further as part of your overall sentencing

10   argument.  We'll get to that.  Is there anything else, then,

11   that we should address at this stage?

12             MR. LANGHOLTZ:  No, Your Honor.

13             THE COURT:  Thank you.  One moment, please.

14        Regarding the defendant's objection with respect to

15   Paragraph 38 and the criminal history points associated with

16   the conviction -- or I should say associated with the judgment

17   which contained a continued without a finding, a CWOF, and the

18   argument being that that is an insufficient record to conclude

19   that there was a proper admission and finding of guilt, I

20   conclude that based upon existing First Circuit precedent and

21   in particular the Dobovsky and the Reyes decisions in this

22   case, the Court will not look behind or beyond what we have,

23   and the Court can treat the CWOF as having been properly

24   arrived at.  Therefore, the objection's overruled.  I'll

25   simply that add that, of course, also it's well established in

 1          the circuit that Massachusetts CWOF dispositions are scored as

 2          criminal history points.

 3                  All right.  I believe that then addresses all the

 4          objections that need to be addressed.  Based upon my rulings,

 5          it results in the following changes to the third revised PSR:

 6                  With respect to Paragraph 36, there are no points, zero

 7          points.  That's per U.S. Sentencing Commission Guideline

 8          Section 4A1.2(a)(2).  That changes Paragraph 40 to a subtotal

 9          of seven criminal history points.  It changes Paragraph 41 to

10          a total criminal history points of nine and a criminal history

11          category of IV.  And turning to the fourth revised PSR, it

12          results in a change to Paragraph 18, specifically what was

13          Criminal History Category V is now Criminal History Category

14          IV.

15                  The resulting guideline range is 210 to 262 months.  But

16          given the statutory maximum of 240 months, which is 20 years,

17          the resulting range is 210 to 240 months.  Attorney McElwee?

18                  MS. MCELWEE:  We agree, Your Honor.

19                  THE COURT:  Attorney Langholtz?

20                  MR. LANGHOLTZ:  Your Honor, we preserve all the

21          objections that we previously made, so we object to the GSR of

22          210 to 240.

23                  THE COURT:  Do you have a position -- I understand

24          your objections and they are preserved, but based upon my

25          rulings do you agree that the criminal history category is IV

1    and that results in a range of 210 to 262 months, but given

2    the statutory maximum of 240 months, 20 years, that the range

3    is 210 to 240 months based upon my rulings?

4         MR. LANGHOLTZ:  Yes, Your Honor.

5         THE COURT:  Thank you.  All right, with that, then,

6    Attorney McElwee, I'll hear from the Government on the matter

7    of sentence.

8         MS. MCELWEE:  Thank you, Judge.

9         THE COURT:  Again, counsel, I leave it to your

10   discretion whether to remove your masks, assuming you've been

11   vaccinated.

12        MS. MCELWEE:  Regarding the statutory factors that

13   the Court must consider under 18 U.S.C. 3553(a), Judge, I'd

14   like to first address the nature and circumstances of the

15   offense.  As the Court well knows, having presided over a

16   trial in this case, this involves a home invasion robbery at

17   the residence of an alleged or known drug dealer in Minot,

18   Maine.  Mr. Williams, the defendant, was an original member of

19   the conspiracy.  He entered the home that was invaded with a

20   loaded firearm and while inside the home threatened victims

21   and in particular pistol-whipped one of the victims during the

22   robbery.  As the Court is also aware, the victims were bound

23   and threatened and they subsequently escaped.

24        At the time Mr. Williams was a convicted felon who was

25   prohibited from possessing a firearm at all.  And so as a

 1    result he remains now, after the dismissal of the 924(c) as a

 2    result of the U.S. versus Davis and remand, the only remaining

 3    defendant facing two counts, because he was a prohibited

 4    person at the time.

 5        With regard to the specific characteristics of this

 6    defendant, as the Court just ruled, Mr. Williams has a

 7    criminal history category of IV.  I recall, Judge, you noting

 8    at the time of the original sentence that Mr. Williams'

 9    childhood was one of the most disturbing and troubled and

10    tragic ones you have read about, and I would concur with that.

11    And so that was, as the Court will recall, I'm assuming, a

12    substantial reason for the significant departure and

13    variance -- excuse me, variance that the Court imposed the

14    first time.  Just in terms of framework, the Court previously

15    found that Mr. Williams was a career offender the first time,

16    which exposed him to a 360 to life range.  But despite that,

17    because of his upbringing and lack of youthful guidance, et

18    cetera, you imposed a sentence of 184 months.  On the robbery

19    you imposed a sentence of 100 months.

20        We now face a guideline range that is not nearly as

21    significant.  And I want to state on the record, although we

22    didn't address it a few moments ago, the Government is not

23    conceding that Mr. Williams is not a career offender.  We

24    think that the law is tricky right now, and we believe that

25    there's a possibility he might be, but we don't see any reason

1    in pursuing that.  And so we didn't object to the probation

2    finding because the Court's previous sentence was so

3    substantially lower I thought it made sense to not pursue that

4    in this case.

5         The question that I'd like to talk to you about is

6    whether or not Mr. Williams gets any reduction at all the

7    second time around.  And I obviously, as you can see from my

8    memo, concluded that he should not and I'd like to argue to

9    you why.

10        All of the 3553(a) factors, with the exception of the

11   personal characteristics of Mr. Williams and his troubled

12   childhood, I suggest argue for a high guideline sentence, if

13   not a variance above the guidelines.  Mr. Williams, however,

14   stands out for me, if we're talking about, as I stated before

15   in the sentencing this morning, avoiding unwarranted

16   sentencing disparities.

17        As noted by the Court earlier this morning,

18   Ms. Hutchinson was one of the four.  She was the driver and

19   she had no criminal history.  She substantially cooperated

20   with the Government, and most importantly she showed

21   extraordinary acceptance of responsibility from day one, while

22   doing so in what was articulated by her to be an abusive

23   relationship with Mr. Williams.

24        Then we had Mr. Douglas, who was the last to join the

25   conspiracy, the last to enter the home, the only one to enter

 1    the home without a weapon.  And while he did possess a weapon

 2    inside the home, he faced only one sentence and that is on the

 3    conspiracy to commit armed Hobbs Act robbery.  As the Court is

 4    well aware and as the defendant here is aware, Mr. Douglas did

 5    cooperate with the Government.  He too showed extraordinary

 6    acceptance of responsibility and that has placed himself at

 7    risk by being a cooperator at the Bureau of Prisons.

 8          One of the things that stands out for me with regard to

 9    Mr. Williams is, at least until now, zero remorse for his

10    behavior, no acceptance of responsibility for his behavior,

11    and the only one to obstruct justice, which is why his

12    guideline range is significantly higher than Mr. Lara's, who

13    was otherwise more similarly situated than the first two

14    defendants I mentioned.

15          I've taken a hard look at Mr. Langholtz's memo, as well

16    as Mr. Rioux's memo on behalf of Mr. Lara, and I went through

17    the third revised presentence report to carefully look at

18    whether there was any racial disparity to address his criminal

19    history category.  And I'll be honest, I did see a number of

20    paragraphs in that report that troubled me, a number of

21    paragraphs where it suggested that Mr. Williams had been

22    approached as part of a group of young men, a group of young

23    black men, in the city who maybe were doing something as minor

24    as loitering on school grounds.  And it appeared to me that in

25    those interactions it's very possible that race was a factor

1    because he was asked to leave and he did leave, and while

2    leaving maybe one of them said something they shouldn't have

3    to the police officer and then were pulled back.  And what

4    could have been a simple dispersing became some engagement and

5    a resisting arrest charge and conviction.  But when I looked

6    carefully through it, fortunately none of those troubling

7    paragraphs received criminal history points.  So I couldn't

8    say that there was anything to reduce in his criminal history

9    category based on racial inequities.  I do agree with the

10    Court's ruling and the probation's change of position on

11    Paragraphs 36 and 37, and so he is I believe solidly and

12    fairly a Criminal History Category IV.

13          So with all that in mind and a guideline range of 210

14    months to 240 months, for all of the appropriate reasons

15    stated at the time of the first sentencing, when Your Honor is

16    always so clear to say this is the sentence I believe is

17    appropriate for this crime, despite many rulings and despite

18    the guidelines, I can't say that there's any reason for a

19    different sentence today.  I just can't.  I don't see anything

20    here that, like the other defendants who I do think should be

21    treated differently than Mr. Williams, I don't see any reason

22    for you to vary.  I believe that with a 360-to-life guideline

23    range you giving him a sentence of 184 months clearly already

24    took into consideration all of the issues that you already

25    addressed with the other defendants, racial inequities, lack

1   of youthful guidance, being raised in an abusive home and not

2   having the support of two parents, and the lack of education

3   that came from his upbringing.  All of those things are things

4   that should be considered, and it's clear to me that you did

5   consider those.  And so for that reason we believe that 184

6   months is the appropriate sentence for this case and for his

7   conduct and his specific role in this case.  And we ask you to

8   impose that.

9       THE COURT:  Thank you, Attorney McElwee.

10      MS. MCELWEE:  Thank you.

11      MR. LANGHOLTZ:  Thank you, Your Honor.  I'm

12  comfortable with the mask.  I'll just keep on going with that,

13  if the Court can hear me.

14      THE COURT:  Yes.

15      MR. LANGHOLTZ:  What has Mr. Williams done with his

16  time in prison?  He's done extraordinarily well.  The

17  Government says he has no remorse, that he has no

18  understanding.  That implies that he has no understanding

19  about who he is and what he wants and that he is not a changed

20  person.  Prison changes people.  They see some terrible

21  things.  I think Mr. Williams mentioned some of that in his --

22  in his letter to you, and he certainly filtered some of what

23  he's seen because I -- I saw the initial draft of that -- that

24  letter and what he saw is really horrifying.

25      Here's a gentleman who's been in and out of trouble with

1    the law, a little time here, a little time there, state time.

2    And then all of a sudden -- and he's pretty young -- all of a

3    sudden he's put in a penitentiary, max, with the worst of the

4    worst, killers, murderers, people that are doing life

5    sentences.  His eyes opened.  He knew he was on the wrong

6    track.  He was scared.  He got in there.  Here's a guy that's

7    in charge of each section.  Those sections are divided

8    geographically.  He was in the Massachusetts section.  He gets

9    in there; there's that one guy; he's called the guy that calls

10   the shots.  Generally those are people that are doing life

11   sentences or close to it.

12          And he was with his Massachusetts people, and he was

13   told that he had to stab one of the inmates because that

14   inmate was out of line.  Well, that was a wake-up call.  He

15   had a big argument with the people that were in charge that

16   told him what he had to do.  He said, I'll fight him.  I'm not

17   going to stab this guy.  I'm starting to think about getting

18   out, seeing my kids.  I don't want to do a life term.  What

19   happens if he dies?  I'll take the consequences.  You want to

20   punish me, fine.  I'll fight him but I'm not going to stab

21   him.  So they get into an altercation.  Both of them get put

22   in seg.  The individual that they wanted out, that they wanted

23   stabbed, ends up going to a different area because of this

24   fight.  So he stands up, does the right thing, quotation

25   marks.  That's how he starts.  That's about a month into his

1    sentence.

2        He was -- and then funny, fate, Judge Torresen comes

3    down to the prison, sort of like an angel, so to speak.  They

4    have this talk.  This is about a month after the fight, plus

5    or minus.  She talks to the Maine people, the Maine inmates.

6    Not too many Maine people are there.  My client has a one on

7    one with the judge.  She tells him, hey, look, you got an

8    opportunity here, do what's right, make your life different,

9    really, you can do it.  I don't know why, but it -- it sort of

10   clicks.  He's probably there about two or three months.  He's

11   already had this thing where they told him he had to stab

12   somebody.  He's starting to think about his kids.  He's

13   maturing.  He told me, he said, this is the first time I

14   thought about anything that had worth.  Before he went in

15   there he was a nihilist, couldn't care about kids, couldn't

16   care about life, didn't really matter what happened.

17       Things happen in prison.  Things happen when you see

18   people hanging themselves, dying there, without family.  He

19   talks to people, other black men, all their family has died,

20   they're alone.  All they can hope for is to die a peaceful

21   death at the prison.  This is groundbreaking material for an

22   individual like him who thinks he's a tough guy.  He knows it

23   all.  He's been through it.  He's been in the streets of

24   Boston.  He's rough; he's seen it all.  But guess what, he

25   didn't.  He got there, he talked to people from his

1    neighborhood, from his area that are doing these long terms,

2    telling him what are you doing.  And it starts clicking.

3        So what does he do?  He jumps right in.  He gets into

4    that program, 250-hour program.  Not many people are doing it.

5    He does it.  He says, I got to do something, after speaking

6    with the judge.  That was a full-time commitment.  Take a look

7    at his certificates.  I mean, from my perspective, that's

8    extraordinary.  I don't -- it's difficult in this milieu

9    because I don't see many people coming from the prison going

10   to be resentenced, but I took a look at Lara's material and

11   Douglas's material for comparison.  I didn't see that.  I

12   heard about tough times, rehabilitation.  Two hundred fifty

13   hours plus 106, if you add them up.  But I talked to

14   Mr. Williams today and he said some of them overlap.  So maybe

15   he's done close to 300 hours of programming.  What can he do

16   right now in the eight years?  What can he do right now?  He

17   can go out, he's an electrician apprentice right now because

18   of what he did, got licensed in West Virginia as an

19   apprentice.  Pays the $50, if he wants to go back to Boston

20   he's got a trade.  Couldn't be a better trade for him.  He's a

21   smart guy; everybody knows it.  Couldn't pick anything better.

22       So he's trying to prepare himself for a life.  He loves

23   his kids.  He wants to be out for them.  He's got a

24   six-year-old daughter, an eight-year-old son.  The daughter

25   was in regular contact with him while he was at Strafford

1    County.  However, being in West Virginia, that sort of ceased,

2    but he contacts her I think on a regular basis, once or twice

3    a week.  The son, that's a little more difficult.  His rights

4    were terminated when he was at Strafford County.  Before that

5    the contact was constant.  Right around that time when his

6    rights were being terminated, the mother of his son died from

7    a heroin overdose.  She was trying to straighten out.  She

8    fell back off, she started using again, and she died.  She was

9    in a coma.  And then the child was moved to another person who

10   had a relationship with the dead mother.  And the child's been

11   going back and forth a little bit.  I think this is probably

12   the second or third placement.  It's not going well.  There's

13   abuse, things of that nature.  So what he wants to do is he

14   wants to get back out, he wants to start work, probably in the

15   electrician field, electrician work, hire a lawyer, see what

16   he can do to save his son.  He wants to get back with his

17   daughter.

18        You know, he's done so much to make himself better.  He

19   really was given a chance and lo and behold he took advantage

20   of it.  How many people really grasp and take advantage of it?

21   Not many.  He did.  He's rehabilitating himself.  I think the

22   case law, the statutes recognize that.  What are you doing,

23   what kind of rehabilitation?  Everybody's talking about giving

24   pretrial defendants an opportunity to do rehab, to try to

25   better themselves, get into programs so they can come back

1    into court, show the judge I'm serious about rehabilitation.

2    And the judges, the law is real clear on this, the Court can

3    acknowledge it.  It should, it should factor those things into

4    sentencing.  And now the Government says, well, that's really

5    inapplicable.  I say it's not inapplicable.  It is applicable

6    and the Court should take note.

7        I did a little bit of math, and it seems to me that

8    based on Mr. Douglas's sentence there was probably a 26

9    percent decrease from his original sentence.  I think

10   Mr. Lara, from what I've just heard today about his sentence,

11   I think it was 32 percent, plus or minus, these are rough

12   estimates.  I think if the Court was to factor in some type of

13   percentage for Mr. Williams, and I would suggest it should be

14   more than both of them, maybe 45, I think it's almost coming

15   down to a credit for time served.  It's coming closer to a

16   hundred months.

17       If the Court factors in the good time -- the lack of

18   good time that he did presentence, I think we're at -- I think

19   that was 28 months if -- because he was arrested in August of

20   2014, he went to Strafford -- he went -- he was sentenced in

21   December of 2016, so I think that's about 28 months.  If good

22   time were factored into that it would be about 32 months.  Add

23   on what he's already done at BOP, I think with the 32 factor

24   for the lack of good time I think you're at about 97 months

25   plus or minus.  So you're in about the eight-year range.

1            The sentence in this case, if the Court were to follow

2     the math that it abided by in Douglas and Lara and factored in

3     all that good that he's done right now while he's been in

4     prison for eight years, I think a sentence of 97 months to a

5     hundred months is appropriate.  If the Court were to factor

6     out the most serious charge, which was the 924(c), you'd be at

7     a hundred months.  So there's a whole bunch of reasons to

8     impose a sentence consistent with what we've asked for, Your

9     Honor.

10            Also the Government does acknowledge that in

11    Massachusetts there were problems the way people were handled,

12    and -- black people were handled and Latinx, too, but

13    primarily black.  But what's very interesting in the

14    Government's observation was that they noted that a lot of the

15    disparity happens early on, and that's exactly what the report

16    said that was presented to the Supreme Court in Massachusetts,

17    that these early on encounters -- and in the report it

18    referred to the initial charging, those have long-term effects

19    about how cases end up.  And I think that's -- I don't think

20    that's a far stretch to say that that's consistent the way

21    some of the cases early on happen on the Mass. criminal

22    history points.

23            So what's interesting in the Government's observation is

24    they make that note that early on that's where a lot of

25    problems are.  And that's consistent with the report from

1    Massachusetts.  That, along with the observations that

2    Attorney Rioux garnered from statistics within this district,

3    I think bodes well for the Court's -- or at least supports my

4    argument that criminal history in this matter should be

5    brought down to the -- criminal history category should be

6    brought down to III rather than IV, a one-level drop.  I think

7    that departure would be reasonable.

8         Based on all those factors, Your Honor, it's reasonable

9    to impose a sentence of time served, and I hope that the Court

10    really weighs Mr. -- Mr. Williams' heartfelt letter.  That

11    says a lot, at least in my opinion, and if he is being honest

12    it shows that he is a different person, he is remorseful, and

13    that he has changed.  I know that he has quite a bit that he'd

14    like to say to you, so at this time I'd like to end my

15    presentation, thank you.

16         THE COURT:  Thank you, counsel.

17         Mr. Williams, as a defendant before the Court who's

18    about to be sentenced, you have a constitutional right to

19    speak to me at this time, but you're not required to speak.

20    It's only if you wish to speak.  Do you wish to speak?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  All right.  If you would stand now,

23    please, and try and articulate and speak loudly since you have

24    a mask on, thank you.

25         THE DEFENDANT:  Thank you.  I've been thinking about

this, well, coming back in front of this Court for a long time now. And I thought about this situation thousands of times, like what I was going to say, and I still don't -- I'm nervous right now. But, you know, when I did go to prison, like he said, I was scared. I never been in a situation like that before, young. Lifers, killers, you name it, they're there, you know what I'm saying. So -- and you've got to learn quick. And as soon as I get there, there's a situation where I'm forced to be quick on my feet whether I'm going to stab this dude or they're going to stab me. So I chose to fight. I could be standing in front of y'all right now with a life sentence. But I'm not. I mean, I don't know, like that was different, like from -- from that, seeing people die, seeing people kill their selves, like just -- it's different.

And then the place I -- it's called misery mountain, like, you get locked down for months at a time, 24 hours for months, come out two times a week for five-minute showers like -- so I really had nothing to do but really think about what I wanted in life, you know. And all that I'm thinking is this -- like I really looked at the bigger picture.

And as I started thinking I felt myself maturing, and I wanted more out of life. And I wanted more -- wanted to be able to do something to provide for my kids, give them something I never had. So I went into programming. You know, I started programming, you know, it was kind of tough between

```
 1    the lockdowns and programming but, you know, I still did it.

 2    And then they sent -- once you complete the programs they let

 3    you pick any MCI you want to go to and stuff like that.  So

 4    after I did the programming came up -- they moved me but

 5    I ain't gonna -- that's probably one of the toughest times of

 6    my life, being in that prison, but I can say I made it out.  I

 7    never asked for a way out of this, never -- nothing.  I did a

 8    crime; I went and do the time; I'm not complaining.  I'm being

 9    a man about it, you know what I'm saying?  I made my bed; I

10    got to lay in it.  It comes with it.  But I just really just

11    want a chance.  Anything could happen at any moment.  I could

12    walk out this door and die.  I don't know what's going to

13    happen.  I don't know my future.  I just want a chance to give

14    my kids a better life, make a life for myself.  That's all.

15    Thank you.

16              THE COURT:  Thank you, Mr. Williams.

17         Mr. Rioux -- not Mr. Rioux, I'm sorry.  Mr. Langholtz,

18    you referred to time served.  I don't know what that is in

19    this case.  What is your understanding of how much time your

20    client has served that would be credited towards his sentence?

21              MR. LANGHOLTZ:  I think it's -- it's around 96

22    months, right around that number.

23              THE COURT:  Thank you.  Attorney McElwee.

24              MS. MCELWEE:  I just want to address something for

25    the purpose of the record, Judge.  I apologize but I did not
```

1    see that this was attached to Mr. Langholtz's memo.  So when I

2    heard him say the thing about remorse and the letter and even

3    describing some of it in his memo, I didn't know where that

4    was coming from.  I have since received it from Ms. Belanger.

5    So I do want to correct my statement that he hasn't shown any

6    remorse, because up until reading this I didn't believe he

7    had.

8         I also want to note one thing, and it doesn't change my

9    recommendation, only because your previous sentence, again, I

10   really think was so considerably lower than the guideline

11   range, you already took into consideration a significant

12   variance, which was justified.  And to look at the numbers

13   today, even -- even the 184 months I'm recommending is still a

14   departure from the guidelines.  But I do want to note that I

15   recall vividly at his first sentencing that Mr. Williams said

16   nothing.  And so to have him standing here today saying as

17   much as he did is considerable progress.

18            THE COURT:  Thank you.

19            MR. LANGHOLTZ:  Your Honor, I just want to clarify.

20   I don't want to misstate anything about time, so his initial

21   arrest was in August of 2014.  Today we're almost at August of

22   2021.  So those are the numbers, Your Honor.

23            THE COURT:  All right.  First of all, let the record

24   reflect that when Attorney McElwee was speaking she was

25   referring to the -- the document she was referring to --

```
 1              MS. MCELWEE:  I apologize.

 2              THE COURT:  -- was the letter attached as an exhibit

 3    to Mr. Langholtz's sentencing memorandum, which I assume

 4    there's no objection to that being treated as an exhibit as

 5    part of the record of the sentencing?

 6              MS. MCELWEE:  Certainly no objection from me.  I

 7    should have said -- instead of this I should have told you

 8    what I was holding.  I just didn't receive -- I didn't read

 9    that letter, I didn't see it.  But it was filed as Exhibit 1

10    to Document 484 on the ECF, Judge, on June 1st of 2021.

11              THE COURT:  Thank you.  Officer Belanger, do you

12    have something you wanted to say?

13              PROBATION OFFICER:  I just didn't know, since we

14    were talking about time served, by my rough calculations we're

15    at approximately 82 months currently.

16              THE COURT:  Eighty-two?

17              PROBATION OFFICER:  Yes.

18              THE COURT:  Thank you.

19              MR. LANGHOLTZ:  Your Honor, when I said the initial

20    90 and change, that was with good time figured into that, so

21    that's where that number came from.

22              THE COURT:  Okay.  In case I didn't ask, Mr.

23    Langholtz, anything further on behalf of your client?

24              MR. LANGHOLTZ:  No, Your Honor, thank you.

25              THE COURT:  All right, thank you.  Counsel, I'm
```

1    going to take a ten-minute recess to reflect on the arguments

2    that have been made, and I'll then be back on the bench to

3    complete the hearing.

4         (A recess was taken from 3:14 p.m. to 3:26 p.m.)

5         THE COURT:  In preparation for today's sentencing I

6    did receive memoranda from the lawyers which I've read.  We've

7    already noted that there's an exhibit that was attached to Mr.

8    Langholtz's memorandum.  It was Mr. Williams's written

9    statement, which I have considered and has been made an

10   exhibit.  And of course I have relied upon the revised

11   presentence investigation reports in this case, specifically

12   the fourth and third revised reports as modified by rulings

13   that I've made in this case.  I'm adopting those reports as my

14   findings in support of the sentence I'm about to impose.

15        As I discussed earlier, Mr. Williams' total offense

16   level is 34, his criminal history category is IV.  That

17   results in a guideline sentencing range of 210 to 240 months,

18   period of supervised release of one to three years, a fine of

19   $17,500 to $175,000, and he's ineligible for probation under

20   the guidelines.  With respect to the sentence I would note

21   that there is a statutory maximum sentence of 10 years for

22   Count 3, which is possession of a firearm by a felon.

23        Is there any objection to the summary I've just

24   provided, counsel?

25             MS. MCELWEE:  No, Your Honor.

1          THE COURT:  Mr. Langholtz?

2          MR. LANGHOLTZ:  Other than the objections that have

3     already been noted, referenced to procedural issues, Your

4     Honor, no.

5          THE COURT:  Thank you.  Of course, I've also

6     listened carefully to the arguments the attorneys have made

7     today, as well as to Mr. Williams' allocution made here in

8     open court.  I've considered all of that in keeping with the

9     guidelines; and, in addition, I'm considering the other

10    sentencing factors recognized under federal law.  These

11    include the nature and circumstances of the crime;

12    Mr. Williams' personal history and characteristics; the need

13    for the sentence to reflect the seriousness of the crime,

14    promote respect for the law, provide just punishment; the need

15    to protect the public from further crimes by the defendant;

16    the need to provide a defendant with educational or vocational

17    training, medical care, or other correctional treatment in the

18    most effective way; and the need to avoid unwarranted

19    sentencing disparities.  I have considered all those factors

20    in determining the sentence in this case.

21         Mr. Williams had a jury trial in 2016, after which he

22    was found not guilty of the two charges to which he's -- for

23    which he's being sentenced today -- did I say not guilty?  He

24    was found guilty, rather, of the two charges for which he's

25    being sentenced today, guilty of conspiracy to commit Hobbs

1    Act robbery and being a felon in possession of a firearm.  He

2    was found not guilty of conspiracy to possess with intent to

3    distribute a controlled substance, and his conviction for use

4    of a firearm during and in relation to a crime of violence has

5    been vacated and no longer exists.

6         I previously sentenced him to an aggregate term of 184

7    months incarceration, followed by concurrent five-year terms

8    of supervised release.  As I noted, as a result of the

9    appellate action he's back for resentencing today on two

10   charges, not three.

11        With respect to the criminal conduct which is --

12   underlines the two convictions, this was a Hobbs Act home

13   invasion robbery of a residence in Minot, Maine, that took

14   place in August of 2014.  The motive was to obtain drugs and

15   proceeds from drug trafficking believed to be in the

16   residence.  It was known to Mr. Williams and his

17   co-conspirators that the person living in the home was himself

18   a drug dealer and that there was reason to believe that there

19   would be drugs and/or money present in the home.  During the

20   robbery Mr. Williams was armed with a 9mm semi-automatic

21   pistol which he used repeatedly to threaten the victims at

22   gunpoint, including at one point pressing the gun up against

23   the head of one of the victims.  After the robbery he was in

24   possession of a 9mm semi-automatic pistol that was taken from

25   the residence.

1      During the course of the home invasion Mr. Williams and

2   his co-conspirators attempted to tie up the victims with zip

3   ties but were unsuccessful.  This robbery would have -- could

4   have ended much worse than it did but for the fact that the --

5   one of the victims broke loose and escaped, and ultimately

6   the -- Mr. Williams and the two co-conspirators in the home

7   also made a run for it and they left.

8      With regard to Count 3, which is the possession of

9   firearm by a felon count, I would note that, as that crime

10   goes it was on the scale of seriousness quite serious, given

11   the fact that he possessed the firearm and used it

12   aggressively against victims in connection with this other

13   crime, the Hobbs Act robbery.  As has been stated both in

14   Mr. Lara's proceeding this morning and I believe at least once

15   or twice here today, this afternoon, in connection with

16   Mr. Williams' sentencing, this was a very, very serious,

17   horrific crime.  And as I mentioned, but for the fact that a

18   victim broke loose, the consequences of it could have really,

19   truly been much more horrific than they were.

20      Mr. Williams' background is one of really a terrible

21   childhood, marred by neglect, physical abuse, sexual abuse,

22   and at a relatively young age he was left to fend for himself

23   on the streets.  And although that childhood does not in any

24   way justify his crimes, certainly helps to explain the path

25   that he was placed on and how he ended up where he was the

night of the home invasion.  He had a limited work history, and in fact the -- his conviction record reflects that this was his second home invasion that he participated in.  He has two other adult assault convictions in addition, one of which involved a handgun and the second of which involved him striking a police officer.  And at the time of this offense, he was still under the age, as I recall, of 25.  Counsel, you'll correct me if I have that wrong.  I believe he was 24. And so he had already amassed a significant conviction record and was involved in some very, very serious criminal conduct involving firearms at the young age of 24.

Mr. Williams is a father.  He has obtained his GED.  His physical and mental health appear to be good, although the records reflect that he was hospitalized in 2012 after sustaining six stab wounds.  And he's been incarcerated since 2014 in connection with this offense.  And so at the time this crime was committed, as I indicated, he already had amassed sufficient convictions to have a criminal history category of IV, had lived on the streets starting in his adolescence, and had a very, very rough life.  Fair to say that Mr. Williams at the time of this crime was a very young man simply wildly out of control.

The -- this particular crime was -- or at least for sentencing purposes it is important to note that both for purposes of the guidelines and generally as I consider the

1    3553(a) sentencing factors, Mr. Williams' conduct was made

2    worse by the fact that he sought to threaten and intimidate a

3    witness in order to try and cause her not to testify against

4    him.  Very, very troubling behavior.

5         Substance use and abuse has certainly been part of

6    Mr. Williams' life, but it's not been cited as a predominant

7    factor in his criminal conduct, and there is evidence he's

8    completed a 90-day drug treatment program while he was

9    previously incarcerated.  But at this point in time it does

10   not appear to figure prominently in understanding both his

11   criminal conduct as well as his opportunity for rehabilitation

12   moving forward.

13        Mr. Williams has sought a downward departure in this

14   case, arguing that his criminal record overstates the

15   seriousness or I should say his criminal history overstates

16   the seriousness of what actually his criminal background is or

17   the likelihood that he might commit another crime.  He argues

18   that there have been large disparities in sentences and

19   incarceration rates in Massachusetts between whites, blacks,

20   and Latinx, citing a study relating to charging practices.

21   This, of course, is of serious concern to me.  I will add,

22   however, that based upon the information that I have with

23   respect to that study and the information I have with respect

24   to Mr. Williams' prior convictions in Massachusetts, I don't

25   find a basis to conclude that he was subject to overcharging,

whether for racial or other reasons.  I'm not discounting the

possibility that that occurred.  I just don't find that on the

record in front of me I can conclude that it did occur.

Mr. Williams has also today endorsed the argument that

Mr. Lara's attorney made earlier today with respect to racial

disparities in sentencing in the District of Maine.  Mr. Lara

presented sentencing statistics which suggest a significant

disparity in sentences as between white and black criminal

defendants in the district.  Now, a significant portion of

those statistics do not account for the defendant's criminal

history or any other variant factor.  And so I don't feel that

I could reasonably form a judgment as to whether the

information as to that cohort of defendants is in any way

statistically significant or reasonably permits one to draw

the conclusion that there is unwarranted sentencing

disparities and has been in the recent past based upon race.

The statistics presented in connection with disparity

between sentences for white and black defendants convicted of

both drug trafficking but with a Criminal History Category

III, which of course is now more focused, show that on average

white defendants received a sentence of 56 months and on

average black defendants received a sentence of 81 months, and

that truly is disparate and is of tremendous concern.  But

this is another instance where absent some additional

information about those cases examined, I'm in the dark as to

1    whether or not there's any statistical significance to that

2    disparity.  We need more information before that type of a

3    conclusion can be drawn.

4         And, finally, the last category related to robbery cases

5    involving defendants with a criminal history category of III,

6    which of course is more now focused than the other two groups

7    of statistics, but that particular group involved a cohort

8    consisting of only a total of seven defendants, five white

9    defendants, two black defendants, which, and without any

10   additional information, again is properly considered to be not

11   sufficient information upon which me, a judge, can draw a

12   conclusion as to whether it has statistical significance

13   without the benefit of additional information.

14        As I said this morning, the disparity argument is a

15   serious one which is worthy of further study, no question.

16   But without more study and more data, it's not one on which I

17   can base a sentencing conclusion or a sentencing decision.  In

18   addition, as I said this morning, I, like many judges, have

19   received training in implicit bias and how that affects

20   judging, and as a result when I exercise my judicial authority

21   I make it a point to be very deliberate about considering the

22   role that a possible implicit bias by me might have in the

23   exercise of my judgment.  This, of course, is particularly

24   important in the area of sentencing defendants.  And although

25   I recognize that, no matter how deliberate I might be, it's no

guarantee that my sentencing decisions will be completely free
of implicit bias, but the approach does ensure that it's at
the forefront of my thinking in these cases and is being
considered by me.  And I am certainly considering it today in
resentencing Mr. Williams.

Mr. Williams also seeks a variance from the guidelines
based upon the efforts he's undertaken to rehabilitate himself
in prison, which he argues reflects significant growth on his
part and also reflects that he is a lower risk of reoffending
once he completes his prison term than he might have been when
he was sentenced previously in this case.  And, interestingly,
he points to a visit to the prison by my colleague, Justice
Torresen, as providing a moment of insight which caused him to
rethink his ways.

Now, I have no way of judging whether that's true or
not, but I will point out that the programming that he's
completed all started in 2019.  He's been incarcerated, of
course, for several years prior to that time, but the 18
self-improvement and educational programs he's completed while
in BOP custody and most recently the inside-outside DAP
program and the Bounce Back program, none of that began until
2019 and seems to coincide with Judge Torresen's visit.

Mr. Williams by my calculation was 24 years old when he
committed this crime after the most horrific, tough childhood
that one can imagine and he's now older.  And so it would be

1    consistent with the idea that the brain matures, impulse

2    control really doesn't reach a full level of maturity until

3    people hit their middle 20s.  It would appear as if

4    Mr. Williams' experience is consistent with that common

5    knowledge.

6         Just as important as what he has done while incarcerated

7    in terms of the completion of programs is what he has not

8    done, and that is he does not present himself today with a

9    history of disciplinary infractions or new criminal conduct

10   while incarcerated that is so significant that it would cause

11   me to believe or disbelieve his assertion that he has matured

12   and now finds value in trying to improve his life.  Therefore,

13   I'm accepting his representations as sincere, and it seems to

14   me it is an appropriate reason to provide a variance in this

15   case.

16        In addition, as was true with Mr. Lara this morning, in

17   considering the level of variance I gave earlier -- the last

18   time I sentenced the defendant, he does present today with one

19   fewer count of conviction.  And so the posture of the case is

20   different.

21        This morning I sentenced Mr. Lara to a period of 126

22   months.  With respect to the two other co-conspirators in this

23   case, one received a sentence of probation and the other

24   received a sentence, as I recall, of approximately 80 months.

25   I would like to just now address the reason for the disparity

1    in sentences in these cases.

2        As to the defendant Ms. Hutchinson, who received a

3    probated sentence, I found then that she was very much under

4    the influence of Mr. Williams, her boyfriend at the time.  Her

5    role in the crime itself was as the driver of the vehicle.

6    She was not present in the house where the most serious

7    offense conduct took place.  She took responsibility for the

8    crime almost immediately, and she provided substantial

9    cooperation to the Government, contributing to Mr. Williams'

10   and Mr. Lara's convictions.

11       As for Mr. Douglas, he was, like Mr. Williams, a

12   principal co-conspirator in the case and in the actions that

13   took place in the house.  He, however, accepted responsibility

14   for the offense immediately or soon, rather, and he provided

15   substantial cooperation again also contributing to

16   Mr. Williams' and Mr. Lara's convictions.  And given his

17   acceptance of responsibility, his cooperation, and judgments

18   that I drew about his risk of reoffending based upon his

19   conduct, I found then and I find today that a substantial

20   disparity between his sentence and those of Mr. Williams and

21   Lara is justified.

22       With respect to Mr. Lara, I conclude that Mr. Williams

23   is -- should not receive as great a variance as Mr. Lara did

24   for two reasons.  First is that Mr. Williams was a felon in

25   possession of a firearm when he -- which he used at the time

1    that he committed this robbery.  He has this additional

2    conviction of being a felon in possession of a firearm.  And,

3    also, following his arrest Mr. Williams obstructed justice for

4    the reasons I've already explained.  And so for those reasons,

5    I've concluded that a downward variance is supported here

6    and -- but not to the extent that I granted with respect to

7    Mr. Lara.

8         Finally, I'll note that I think the Government

9    justifiably points out that I've already varied once in this

10   case based upon a much higher level under the guidelines, a

11   much greater sentencing range under the guidelines, than is

12   before me today.  I'll simply note in that regard that that

13   was then and this is now.  Mr. Williams is -- we've had the

14   benefit, rather, of several years now of Mr. Williams being

15   incarcerated, and that rightfully is taken into consideration

16   since I am sentencing him today, not the man that he was the

17   last time I sentenced him.

18        I would also note that, of course, the Court might

19   choose to vary from the guidelines -- a downward variance from

20   the guidelines, but that doesn't mean that the guidelines

21   themselves that the Court is considering doesn't influence the

22   Court, doesn't influence the amount of variance deemed

23   appropriate.  And here today I am operating with a much lower

24   guideline range than I was the last time I sentenced

25   Mr. Williams.

1          Counsel, before I complete my analysis, then, is there

2     any aspect of your arguments I haven't addressed that needs to

3     be addressed?

4          MS. MCELWEE:  No, thank you, Your Honor.

5          MR. LANGHOLTZ:  No, Your Honor, thank you.

6          THE COURT:  Mr. Williams, if you'll stand now,

7     please.  In addition to the various factors I've cited, I'm

8     also required to consider what the purposes of the sentence

9     are, and it seems to me that, of course, here we've got a very

10    serious crime which deserves a very serious sentence.  It

11    should reflect the seriousness of the criminal conduct and

12    also provide you with adequate deterrence moving forward and

13    provide protection to the public.  But I do find that the

14    length of the sentence should be significantly less than what

15    was previously imposed, taking into consideration the various

16    things I've already noted, because although deterrence and

17    protection of the public remain a primary concern for me and

18    are primary purposes of the sentence, those concerns are

19    somewhat reduced given your track record.

20         For all those reasons I've concluded that a fair and

21    just sentence which is sufficient to achieve its purposes but

22    not greater is as follows:  On Count 2, the Hobbs Act robbery

23    charge, I'm sentencing you to a total term of 140 months; and

24    on Count 3, felon in possession charge, I am sentencing you to

25    a concurrent term of 60 months.  I'm ordering that you be on

1  supervised release for a period of three years following the

2  completion of your sentence, subject to all the conditions of

3  supervised release that were previously ordered.

4      And, Mr. Langholtz, is there any objection at this time

5  to any of those conditions?

6      MR. LANGHOLTZ:  No, Your Honor.

7      THE COURT:  Thank you.  I'm imposing a special

8  assessment of $200, $100 on each count.  I'm not imposing a

9  fine because I find that Mr. Williams does not have the means

10  with which to pay a fine.

11      And finally, counsel, is there any aspect of the

12  sentence I haven't addressed that needs to be addressed?

13      MS. MCELWEE:  No, thank you, Your Honor.

14      MR. LANGHOLTZ:  No, Your Honor, thank you.

15      PROBATION OFFICER:  Your Honor, I believe you said

16  three years of supervised release.  Do you intend that to be

17  three years on each count to run concurrently?

18      THE COURT:  Thank you.  To be complete, supervised

19  release is three years on each count to run concurrently.

20      Mr. Williams, as I believe you know, you do have the

21  right to appeal, certainly from the sentence I've imposed and

22  perhaps to some extent your conviction, although you've

23  already exercised that right with respect to the conviction.

24  But to appeal any aspect of the sentence or your conviction,

25  you have to file a written notice of appeal within 14 days of

1    today or else you'll have waived that right.  Do you

2    understand?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  If you can't afford to file the appeal,

5    you have the right to request the clerk to file it without

6    charge to you; but, again, your written request has to be

7    submitted and received within 14 days.  Do you understand?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  All right.  Mr. Williams is committed to

10   the custody of the U.S. Marshal for the District of Maine in

11   furtherance of the sentence.  Mr. Williams, this is -- you

12   still have a significant prison time ahead of you; it's

13   greatly reduced from what it was.  But you've earned my

14   confidence that you're going to use that term -- the rest of

15   that term wisely and safely.  You've cited the fact that

16   you're a father and that you care about your kids.  I hope

17   that you'll be inspired by the fact that what you do during

18   the remaining time that you're in prison matters; it matters

19   not just to you but it matters to them.  You have the

20   potential to demonstrate that people can change, people can

21   grow, and people can redeem themselves.  And that will be a

22   powerful lesson for your child.  And so I hope that you'll

23   view this -- the remaining term of your incarceration as a

24   positive opportunity to impress your children as to -- as in

25   the -- as in the way that you have impressed me to a certain

1    degree today.

2        You've had a very tough ride in your life, but you're

3    still going to come out a relatively young person.  You have a

4    lot of life ahead of you; you have a lot good to live for.  So

5    I know that I speak for everyone that's here today in saying

6    that our hope for you is that down the road you'll be able to

7    look back on this, put this all behind you, see that you did

8    that, and be proud of what you've accomplished.  That's my

9    hope for you.

10            THE DEFENDANT:  Thank you.

11            THE COURT:  Good luck to you.  Counsel, thank you

12    for your assistance.  Officer Belanger, thank you for your

13    assistance in this case.  Court is now adjourned.

14                (Time noted:  3:55 p.m.)

15                    **C E R T I F I C A T I O N**

16    I, Lori D. Dunbar, Registered Merit Reporter, Certified

17    Realtime Reporter, and Official Court Reporter for the United

18    States District Court, District of Maine, certify that the

19    foregoing is a correct transcript from the record of

20    proceedings in the above-entitled matter.

21    Dated:  August 17, 2021

22                /s/ Lori D. Dunbar

23                Official Court Reporter

24

25